UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
                                                                :
**FAYGE GROSS**,                                                :
                                                                :
                      Petitioner,  :
                                                                :  **MEMORANDUM DECISION AND**
         – against –                          :  **ORDER**
                                                                :
                                                                :  23-CV-1632 (AMD)
**HERSCH GROSS**,                                               :
                                                                :
                                                                :
                      Respondent.  :
--------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

      Petitioner Fayge Gross petitions the Court for the return of her son, A.G., to England pursuant to the Hague Convention on the Civil Aspects of International Child Abduction[1] as implemented by the International Child Abduction Remedies Act.[2] A.G., now 14 years old, came to New York to stay with the respondent, his father, in April 2022, but did not want to return to England. He currently lives with the respondent and attends school here. For the following reasons, the petition is denied.

## PROCEDURAL HISTORY

      On May 8, 2022, the petitioner filed a Hague Convention petition for A.G.'s return to England. (ECF No. 37 at 3.) She withdrew her petition on August 22, 2022 after the parties agreed to arbitrate the dispute before a Rabbinical panel in England. (*Id.*) The arbitration was not successful, and on March 15, 2023, the petitioner filed this petition (ECF No. 1), as well as an application for emergency relief in the form of an Order to Show Cause (ECF No. 2), which the Court issued that day (ECF No. 5). The respondent answered the petition on March 31,

---

[1] Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (the "Convention" or "Hague Convention").
[2] 42 U.S.C. §§ 11601 et seq. ("ICARA").

2023. (ECF No. 9.) On April 4, 2023, the Court held a Show Cause hearing and referred the parties to mediation. (*ECF Order dated April 4, 2023*.) The parties did not come to an agreement (ECF No. 11), so the Court held a bench trial between July 10 and 12, 2023. The following witnesses testified: the petitioner, Isiah Halpern, Oizer Greenfeld, Chaim Mittelman, Chaya Gluk, Zev Poznanski, and the respondent. The Court also interviewed A.G. *in camera* on July 12, 2023.[3] The petitioner and the respondent filed Proposed Findings of Fact and Conclusions of Law on August 17 and October 27, 2023, respectively. (ECF No. 32; ECF No. 37.) The petitioner also filed a reply styled as "Proposed Findings of Fact" on November 13, 2023. (ECF No. 39.)

## FINDINGS OF FACT

The petitioner and the respondent married in England in 2002. (Tr. 19:13-17.) They have four children. (Tr. 20:9.) A.G., now 14 years old, was born in Manchester in 2009 and is a British citizen. (Tr. 21:3-10.) The family lived in England from 2002 until September 2016, when they moved to New York for about a year. (Tr. 22:5-20.)

In September 2017, while the family was living in New York, the petitioner and the respondent separated. The petitioner returned with the children to Manchester, and the respondent lived in London with his brother, and then moved to Manchester. (Tr. 22:10–23:3, 441:5-10.) In 2018, the couple obtained a *Gett*, which effectuates a divorce between a Jewish couple.[4]

---

[3] The petitioner, Zev Posnanski, and Isiah Halpern testified remotely from England.

[4] The petitioner and the respondent are still civilly married under the laws of the United Kingdom. (Tr. 28:1-2.)

2

In 2019, the respondent remarried and moved to New York permanently; the petitioner and the children, including A.G., continued to live in Manchester.  (Tr. 29:16-25.)[5]  The petitioner testified that the respondent saw his children "sporadically" and traveled to England "maybe . . . three times."  (Tr. 28:10, 30:6-7.)  The respondent testified that he saw A.G. "quite often" "[i]n the beginning," but was eventually "blocked from seeing him."  (Tr. 441:5-10.)  The parties agree that when "[the respondent] went away from Manchester he saw [A.G.] very little."  (Tr. 441:11-15.)

Things became especially difficult for A.G. during "[t]he last year before [he] went to America."  According to the petitioner, A.G. was "very disturbed because he didn't know when his father" was going to call or return home.  (Tr. 64:12-20.)  He also missed school "quite a lot;" the petitioner testified that "the teachers in our school are very primitive and we don't have many divorces in our community . . . and they weren't sure how to deal with him."  (Tr. 64:9–65:13, 65:23-25.)

The headmaster at A.G.'s school in Manchester, Zev Poznanski, testified that A.G's attendance "became more and more erratic" in the 2021-2022 school year, and "he was missing more and more days."  (Tr. 329:5.)  If A.G. attended at all, he came late or left early.  Poznanski "receive[d] daily reports" about A.G.'s "poor performance."  (Tr. 330:11-15.)  His teachers said that "he was extremely difficult in class," and that he "wasn't cooperating."  (Tr. 341:8-13.)  A.G. came to see Poznanski "quite often" (Tr. 332:21), and told Poznanski that he "could not "manage," that it was "very hard for him," that he did not "want to be here anymore," and that he was "finding it difficult."  (Tr. 332:21–333:5.)  While A.G. "wasn't forthcoming" about his

---

[5] At some point, the respondent's oldest daughter moved to New York and lived with the respondent.

3

"family situation," he "did mention he was not happy" at home or in school. (Tr. 333:13-19.) A.G. "wasn't a happy boy at all."[6] (Tr. 333:21.)

The respondent testified that A.G. told him during telephone conversations that he went to school "very, very little" and that he had a "very hard time." (Tr. 419:6-7.) A.G. said that he did not feel like "normal child," that "nobody cared for him" or "understood him," and that people "[l]ooked down" on him because he was the child of divorced parents. (Tr. 419:10-14.)

Isiah Halpern testified that "a lady called Mrs. Weisz" asked him to "try and intervene after [the petitioner] was divorced in the Jewish Court of Law in order to try and make some sort of child arrangements possible between [the respondent and the petitioner]." (Tr. 106:3-7.) Halpern believed that A.G. and the petitioner were close, and that A.G. was "comfortable at home" and "happy around her." (Tr. 108:17-21.) Nevertheless, "A.G. expressed [] frustration" because the respondent was not living at home, and A.G. was "keen to speak" with him. (Tr. 110:17-20.) In addition, A.G.'s headmaster asked Halpern to try to "motivate A.G. a little bit more." (Tr. 113:13-15.)[7]

The petitioner and the respondent agreed that A.G. would spend most of April, including Passover, with the respondent in New York. A.G. was scheduled to leave on April 2 and return on April 27, 2022. (ECF No. 32 at 4; ECF No. 37 at 1–2; Tr. 34:10-15.)

At first, A.G. was happy and excited to be in New York. However, he became more and more agitated about returning to England; he repeatedly told the respondent that he did not want to go back. (Tr. 434:2-9.) A.G. said that he did not feel "like a normal child" in England, that

---

[6] Poznanski told the petitioner that A.G. was "suffering," and asked her to make sure he came to school on time. (Tr. 336:6.) The petitioner "blam[ed] us, blam[ed] the boy," and was not cooperative. (Tr. 336:9-11.)

[7] Halpern did not see or speak with A.G. in the weeks leading up to his April 2022 trip to the United States. (Tr. 112:14-21.)

4

"nobody cared for him, nobody understood him." (Tr. 419:10-14.) The respondent told A.G. that he should enjoy the holiday and wait until after Passover to see how he felt about returning home to England; after Passover, A.G. still insisted that he did not want to return to England. (Tr. 428:16-24.)

The respondent recommended that A.G. call his rabbi in Manchester for advice; he believed that "[A.G.] would truly consider" the rabbi's instructions. (Tr. 434:23-25.) A.G. called Rabbi Horowitz on April 25, 2022, who told A.G. that "he should try to speak to [the petitioner] and ask permission to stay for another few weeks," which would be after Shavout. (Tr. 436:7-10.) Shortly thereafter, A.G. called the petitioner and asked if he could stay in New York; she refused to discuss the issue with A.G. because it was "not a discussion for children," but rather "a discussion for adult[s]." (Tr. 94:9-15.) The respondent told A.G. that he had to return to England, and that the respondent would do whatever he could to help him with his life in England. (Tr. 429:1-4.)[8] At one point, A.G. became "very emotionally disturbed" about the prospect of returning and was "shivering" and "shaking." (Tr. 456:20–457:4.)[9]

On April 26, 2022, the day before A.G.'s scheduled return, the respondent's brother texted the petitioner that A.G. did not want to fly back to England and that he would not be returning. (Tr. 35:1-11.)

On May 5, 2022, the respondent enrolled A.G. in a Brooklyn school. The respondent testified that A.G. began to study harder—"[e]very day, twice a day" (Tr. 446:20-21)—and that

---

[8] *See also* Tr. 456:14-18:
  Q. After Passover . . . and before the time of his flights . . . did you ever suggest to [A.G.] directly that he needs to go back even though he doesn't want to?
  A. Every time I told him.

[9] More recently, A.G. has had "nightmares that people come to bring him back to England." (Tr. 457:3-4.)

5

he started "catch[ing] up" in school. (Tr. 451:7-9). Chiam Mittleman, a social worker who provided therapy to A.G., said that A.G. did not "like his past" and wanted to stay in New York with the respondent. (Tr. 221:15-17.) A.G. told Mittleman that in England he was not "successful" in school, was not a "functioning child," and that he "didn't have a normal life." (Tr. 215:12-17, 221:21-22.) A.G. became "emotionally disregulated" at the prospect of returning to England (Tr. 216:14-18, 248:1), and he got "shaky and jumpy" any time someone raised the subject of returning. (Tr. 186:11-14). Mittelmen also explained that in A.G.'s community, divorce is a source of "shame" and causes "extreme[] distress[]" for children of divorced parents. (Tr. 218:19-25, 219:1-14.) He believed that forcing A.G. to return to England would be "emotionally harming" to him. (Tr. 217:24-25, 233:19-23.)

Mittleman testified that A.G. is "more successful," "more happy" and doing "much better" in New York. (Tr. 186:11-13; 248:6-7.) Oizer Greenfeld, one of A.G.'s school counselors, testified that A.G. has "made a lot of progress" in school. (Tr. 147:10.) In the beginning, A.G. "couldn't have a normal conversation," would "tease" and "lie." (Tr. 146:25–147:1.) Now, he is "able to have a give and take in conversation," "sit in class and obey rules," and "learn[] whatever the teacher wanted." (Tr. 147:4-10.) The respondent testified that A.G. wakes up at 6 a.m. to study the Talmud (Tr. 446:20–447:3), and that his ability to read Hebrew has improved quite a bit. (Tr. 448:1-452:17). The respondent gave A.G. a cell phone so that he could call the petitioner. (ECF No. 37 at 4.) However, at the time of trial, A.G. had little contact with the petitioner.[10] (Tr. 51:7-8.)

---

[10] According to the respondent, in recent months the "relationship between [the petitioner] and A.G. has never been better;" the petitioner "recently visited the United States and was able to see A.G. almost every day during her two-week stay, and they speak regularly." (ECF No. 41 at 1.)

6

I.  *In Camera* Interview of A.G

The Court interviewed A.G. *in camera* on July 12, 2023 in chambers, with a Yiddish interpreter.[11]

A.G., then 13 years old, was polite and soft-spoken, although clearly concerned about the case and how the Court would decide. He understood why the Court was speaking to him: "My father told me that . . . you're going to speak to me . . . because my mother wants me back." (Tr. 362:20-24.) A.G. added that his father was "not pushing me back and he's not pushing me to stay," and told him to tell the truth. (*Id.*)

A.G. was unhappy in England, particularly after his parents' divorce. He "wanted to be with [his] father" (Tr. 367:17), but the petitioner did not let him see the respondent. His "school [was] also very bad to [him]," and people there "looked down" on him. (Tr. 375:6-24.) He said that he did not have many friends and did not feel "like a normal boy." (Tr. 369:7-10, 370:3-5.) Sometimes, A.G. simply "stayed in bed" because he was depressed and because he "suffered." (Tr. 381:22–382:1.) He stopped going to school regularly, and "roam[ed] the streets, and "vaped" occasionally.[12] (Tr. 337:3-10.)

He was also unhappy at home. He said that the petitioner called him a "special needs child," locked him out of the house, and hit him. (Tr. 382:9-11.) She also told him that she did not want him or need him. (Tr. 384:14-15.) The Court asked, "Why do you think she wants you to come back and live with her now?" A.G. replied, "That's — that's my question . . . She didn't let me go and she didn't want me." (Tr. 384:22-23.)

---

[11] During the interview, A.G. spoke in English and in Yiddish, with occasional assistance from the Yiddish interpreter.

[12] A.G.'s relatives let him work for them; he stocked shelves at a nearby grocery, worked for a delivery company, and set up speakers for weddings. (Tr. 376:16–377:5.)

7

A.G. said that the respondent told him "it's good to talk to mom, have connections to mother, go to mom, but he never forced me to go." (Tr. 396:13-16.) He has his own cell phone, but at the time of the trial he had not spoken with the petitioner for a few months. (Tr. 385:5-19.) He explained, "Every time I talk with her, it's hard for a few weeks after that." (*Id.*) A.G. felt that his mother was "trying to buy [him] off," and said that she promised to give him "money" and "prizes" if he came back. (Tr. 386:2-6.) A.G. also believed that the petitioner was "trying to force me to come back" and "doing things against my will." (Tr. 389:19-24.)

A.G. was adamant that he wanted to live in New York. He enjoys school, and "everything" about the curriculum. (Tr. 390:14-18.) Since coming to New York, he has missed school only once, when he had a virus. (Tr. 396:2-25.) "The principal, the teachers, [and his] friends" are concerned about him, and no one "looks down" on him. (Tr. 390:14-18; *see* Tr. 391:1 ("Here, I'm a somebody. I have a lot of friends.").) He explained, "I grow here, I'm doing well here, I have options here, I have everything here going for me." (Tr. 399:24–400:1.) The Court asked, "Couldn't you have those things in Manchester, too?" A.G. replied, "No, because they looked at me crazy there," "Everything I did was, like why, or I wasn't able to talk to anyone." (Tr. 400:2-8.)

A.G. said that no one "pushed" him to want to stay in New York — "I want it for my heart." (Tr. 407:4-5.) The Court concluded by asking if A.G. had anything else he wanted to say. He replied, "Just I want to stay . . . [i]f you can help me." (Tr. 406:19-23.)

## CONCLUSIONS OF LAW

The International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*, permits a parent (or other individual or institution) seeking relief under the Hague Convention to file a petition for return of a child in state or federal court, *id.* § 9003(a)-(b), and directs courts to

8

"decide the[se] case[s] in accordance with the Convention," *id.* § 9003(d). ICARA "empower[s] courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." *Id.* § 9001(b)(4); *see* Art. 19, Treaty Doc., at 11 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue"). The Convention's "core premise" is that "'the interests of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020) (quoting Convention Preamble, Treaty Doc., at 7). Accordingly, the Convention generally requires the "prompt return" of a child to the child's country of habitual residence when the child has been wrongfully removed to or retained in another country. Art. 1(a), Treaty Doc., at 7; *see also* Art. 12, *id.*, at 9. This requirement "ensure[s] that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Art. 1(b), *id.* at 7.

Return of the child is, however, a general rule—there are exceptions. As relevant here, the Convention provides that return is not required if "[t]here is a grave risk that . . . return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," or if "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views [,]" *id*. art. 13.[13]

The respondent argues that A.G. would face a grave risk of harm if he were returned to England and that he has reached an age and is sufficiently mature for the Court to consider his views. (ECF No. 37 at 6.) The petitioner argues that "there is no risk of harm to [A.G.]" if he

---

[13] The parties do not dispute that A.G. was habitually resident in England. (ECF No. 39 at 7.) The record also establishes, contrary to the respondent's argument, that the petitioner was exercising her custody rights and did not consent to the removal.

9

were returned. As for whether the Court should consider what A.G. wants, the petitioner's argument is not that A.G. is too young or immature; rather, she says that "undue influence seems to abound in other areas in this matter." (*Id.* at 10.) She points out that the respondent's "abandonment and public divorce" "left [A.G.] facing social stigma in England that he does not face here." (*Id.*) She states that "[e]ven without intending to influence the child, the amount of time [A.G.] has been in the sole custody and care of [the r]espondent can be construed as undue influence." (*Id.*)[14]

The Court first addresses whether A.G. is old enough and sufficiently mature for the Court to take his feelings into account. The fact that a sufficiently mature child objects to repatriation "may be conclusive;" in other words, a district court can decline to order the return of a wrongfully retained or removed child on that ground alone. *Blondin v. Dubois*, 238 F.3d 153, 166 (2d Cir. 2001) *abrogated on other grounds*, *Golan v. Saada*, 596 U.S. 666 (2022). A court may "take account of" a mature child's objection to return, but should not accede to it automatically. A court always retains discretion to order repatriation notwithstanding the applicability of any exception if return would fulfill the purposes of the Convention. In cases involving the mature child exception, the court should be mindful of "the potential for undue influence by the person who allegedly wrongfully retained the child." *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 615 (E.D. Va. 2002). Moreover, "[a] lengthy wrongful retention could enable the child to become comfortable in his or her new surroundings, which may create a desire to remain in his or her new home." *Tsai–Yi Yang v. Fu–Chiang Tsui*, 499

---

[14] The petitioner also objects that the respondent's counsel "admitted to conversations with [A.G.] about the case," and that "communications between attorney and child violate the attorney-witness rule and can have undue influence on child." (*Id.* at 12.) This argument is meritless. The respondent's counsel met A.G. before he agreed to represent the respondent. A.G. is not a party to this case, and the petitioner has not cited any case law to support her claim that the respondent's counsel violated any ethical rules.

10

F.3d 259, 280 (3rd Cir. 2007) (finding that "[e]ven if the record supported a finding that [respondent] met his burden of proving the applicability of the exception to this case, it cannot be said that the District Court abused its discretion by refusing to apply the exception," because that "would reward [respondent] for violating [petitioner's] custody rights, and defeat the purposes of the Convention"). Finally, a court can decline to apply the mature child exception even in the absence of undue influence. *See id.* at 279 n. 2 ("[T]he record is sufficient to support the District Court's determination that [the child] was not sufficiently mature for a court to appropriately consider her views and that the application of the exception in this case would frustrate the purposes of the Convention, absent a determination of undue influence.").

"Whether a child is mature enough to have its views considered is a factual finding" that a district court must make in light of the specific circumstances of each case. *Simcox v. Simcox*, 511 F.3d 594, 603 (6th Cir. 2007). "Given the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate." *de Silva v. Pitts*, 481 F.3d 1279, 1287 (10th Cir. 2007). There is no "minimum age at which a child is old enough and mature enough to [object and] trigger this provision." *Velozny on behalf of R.V. v. Velozny*, 550 F. Supp. 3d 4, 22 (S.D.N.Y. 2021), *aff'd*, No. 21-1993, 2021 WL 5567265 (2d Cir. Nov. 29, 2021). *See Blondin*, 238 F.3d at 166 (declining to conclude that "under the Convention, as a matter of law, an eight-year-old is too young for her views to be taken into account . . . as this would read into the Convention an age limit that its own framers were unwilling to articulate as a general rule") (Elisa Perez-Vera, Explanatory Report to the Convention, ¶ 29).

There is a distinction between a child's "objection" to return under the Hague Convention, "and a child's wishes, as expressed in a custody case." *Valles Rubio v. Veintimilla*

11

*Castro*, No. 19-CV-2524, 2019 WL 5189011, at *19 (E.D.N.Y. Oct. 15, 2019), *aff'd*, 813 F. App'x 619 (2d Cir. 2020) "[T]he notion of 'objections' . . . is far stronger and more restrictive than that of 'wishes' in a custody case." *Morrison v. Dietz*, 2008 WL 4280030, at *13 (internal quotation marks omitted). A child's preference to remain in the United States rather than a particularized objection to repatriation may provide a basis for a court to find the mature child exception inapplicable. *See, e.g.*, *Falk v. Sinclair*, 692 F. Supp. 2d 147, 165 (D.Me. 2010) ("[The child] made clear to me that, despite her strong negative feelings about her German school and a preference to remain in Maine, she does not object to being returned to Germany. Expression of a preference to remain in the respondent's country 'is not enough . . . to disregard the narrowness of the age and maturity exception to the Convention's rule of mandatory return.'") (quoting *Yang*, 499 F.3d at 279); *Trudrung v. Trudrung*, 686 F.Supp.2d 570, 577–79 (M.D.N.C. 2010) (finding 15-year old sufficiently old and mature for his opinion to be considered, but ordering return because he had merely testified that his preference was to remain in the United States while expressing no strong objection to returning to Germany, and because his decision was "likely influenced at least in part by his custodial presence with his mother" and "reflect[ed] the product of limited analysis"); *but see de Silva*, 481 F.3d at 1287 (affirming district court decision to apply the age and maturity defense and refuse repatriation where 13–year old had stated that he had made friends in the United States, described his house as "really big" and "a great place" where he has a computer and everything he needs for school and indicated that he thought the school was better here). Like the determination of "maturity," a finding that a child does not truly "object" to being returned to his country of habitual residence, particularly when based on the district court's first-hand observation of the child, "is of the sort peculiarly within the province of the trier of fact." *Blondin II*, 238 F.3d at 167.

After a careful analysis of the record, the Court concludes that the respondent has established by a preponderance of the evidence that the mature child exception applies.

The parties do not appear to dispute that A.G. strenuously objects to returning to England, and that he has articulated the reasons for his objections: his academic struggles and general unhappiness in England in contrast with his life in New York, where he has friends and does well. The reasons are apply supported in the record. First, A.G. struggled emotionally and academically in England, which the petitioner does not deny. He told the Court that he did not have many friends and did not feel "like a normal boy." (Tr. 369:7-10, 370:3-5.) His school was "very bad to [him]," and people there "looked down" on him. (Tr. 375:6-24.) A.G. told Chiam Mittleman that he was not "successful" in school, was not a "functioning child," and that he "didn't have a normal life." (Tr. 215:12-17, 221:21-22.) Sometimes, A.G. simply "stayed in bed" because he was depressed and because he "suffered." (Tr. 381:22–382:1.) Eventually, he stopped going to school and "roam[ed] the streets." (Tr. 374:15.)

Zev Poznanski, A.G.s headmaster in Manchester, said that A.G. missed school often, was "extremely difficult in class," and "wasn't cooperating." (Tr. 341:8-13.) Poznanski received "daily reports" of A.G.'s "poor performance." (Tr. 329:24, 330:11-15.) When A.G. came to see Poznanski — which was "quite often" — he said things were "very hard for him," that he did not "want to be here anymore," and that he was "finding it difficult." (Tr. 332:21–333:5.) Although A.G. "wasn't forthcoming" about his "family situation," he "wasn't a happy boy at all." (Tr. 334:14-21.)

The petitioner also agreed that A.G. missed school "quite a lot." (Tr. 65:23-25.) Although she testified that shortly after she and the respondent separated, A.G. seemed happy and went to school regularly, she conceded that "[t]he last year before he went to America . . .

13

that's when he was struggling more, particularly because the teachers in our school are very primitive and we don't have many divorces in our community," "and they weren't sure how to deal with him."[15] (Tr. 64:9–65:13.) She said his "head was very busy the whole time," and he became "very disturbed." (Tr. 25:1-4, 64:9–65:13.)

Second, A.G. has thrived in New York. He likes living with his father, with whom he has wanted to live since the divorce. (Tr. 368:17.) He is doing far better in school than he did in England (Tr. 453:2-11.), and feels that "[t]he principal, the teachers, [and his] friends" in New York are concerned about him. (Tr. 390:14-18.). Unlike in England, where he missed school frequently, he now enjoys learning "everything" about the curriculum at his current school (Tr. 390:14-18), and has been studying diligently to catch up. (Tr. 446:20-21; 451:7-9.) He explained, "I grow here, I'm doing well here, I have options here, I have everything here going for me." (Tr. 399:24–400:1.)

Other witnesses corroborated A.G.'s testimony. Mittleman said that A.G. is "more successful" and "more happy over here." (Tr. 248:6-7.) Oizer Greenfeld stated that A.G. has "made a lot of progress" since coming to New York. (Tr. 147:10.) When he first started school, he "couldn't have a normal conversation," would "tease" and "lie." (Tr. 146:25–147:1.) Now he is "able to have a give and take in conversation," sit in class and obey rules," and learn[] whatever the teacher wanted." (Tr. 147:4–10.) And, the respondent explained that A.G. is motivated to study the Talmud, and that his Hebrew has markedly improved. (Tr. 448:1-452:17.)

Third, this is not a case in which the child "harbors conflicting emotions" in "an international tug-of-war." *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 208 (E.D.N.Y.), *aff'd*, 401 F. App'x 567 (2d Cir. 2010). A.G. has never wavered in his desire to live with the respondent,

---

[15] Mittleman also explained that in A.G.'s community, divorce is a source of "shame" and causes "extreme[] distress[]" for children of divorced parents. (Tr. 218:19-25, 219:1-14.)

14

and it is equally clear that he fears returning to England. During his interview, he became noticeably distressed when the Court asked him about the possibility of returning to England. When the Court asked him if he felt that he could also be successful in Manchester, A.G. replied that he "never like[d] living in Manchester" "because they looked at me crazy there" and he "wasn't able to talk to anyone." (Tr. 389:8-17, 400:2-8.) The respondent testified that A.G. became visibly agitated about returning to England as the return date got closer. (Tr. 428:9-11 ("he wasn't okay and he started to cry, he doesn't want to go back").) Any time someone raised the subject, he got "shaky and jumpy." (Tr. 186:11-14). The Court also considers A.G.'s heartfelt plea to the Court at the conclusion of his interview: "I want to stay . . . [i]f you can help me." (Tr. 406:19-23.)

There is no meaningful disagreement about whether A.G. is sufficiently mature for the Court to consider his views. He is now fourteen years old. He cogently and poignantly described his academic struggles in England, as well as his general unhappiness at home—testimony that was largely corroborated. His reasons for wanting to stay were rational and mature: he has friends, he is thriving in school, and is comfortable living with the respondent. His opposition to returning to Manchester is equally rational: he felt ostracized, was depressed, and rarely attended school and did poorly when he did attend. Other witnesses corroborated the dramatic improvement in his academic performance and his emotional state since he has been in New York. (Tr. 147:4-10, 186:11-13; 248:6-7, 446:20-2, 451:7-9.)

While the petitioner does not say that A.G. is too young or immature, she does argue that "there is a strong possibility that [A.G.'s] wishes were unduly influenced by [the respondent]." (ECF No. 22 at 12; ECF No. 32 at 10–15.) However, she does not allege that the respondent pressured A.G. or that A.G. is parroting something that the respondent told him—nor could she

15

do so persuasively, because there is simply no credible evidence that the respondent pressured A.G. to stay in the United States. In fact, the respondent was prepared to send A.G. back to England as scheduled at the end of April 2022. (Tr. 429:1-4.) That did not happen because A.G. panicked at the prospect of returning and refused to go. (Tr. 456:20–457:4). Nor has the respondent tried to shut down communication between A.G. and the petitioner. In fact, the respondent "took. . . steps to have [A.G.] communicate with her." (Tr. 563:17-19.) He got A.G. a cell phone so that A.G. could call her, and he encouraged him to keep in touch with her. [16] (Tr. 563:19.) At least the time of the trial, A.G. did not want to speak with the petitioner; however, that was not because the respondent discouraged him from doing so. (ECF No. 37 at 4.) There was, moreover, no evidence that the respondent coached A.G. Indeed, A.G. was clear that "no one pushed" him to make this decision, and that his father was "not pushing [him] back" or "pushing [him] to stay." [17] (Tr. 362:23-25.) A.G. wants this "for [his] heart." (Tr. 407:1-5.) Nothing in the record suggests that the respondent "articulated a desire [for A.G.] not to return." *Valles Rubio*, 2019 WL 5189011, at *19 (citing *Anderson v. Acree*, 250 F. Supp. 2d 876, 884 (S.D. Ohio 2002)). In short, the evidence establishes that A.G. is old enough and sufficiently mature for the Court to consider what he wants, and what he wants fervently is to live with the respondent in New York. His reasons are rational and particularized, and the Court accepts them.

Finally, the respondent asserts that returning A.G. to England will subject him to a grave risk of harm. He argues that the petitioner and Isiah Halpern physically abused A.G. (ECF No.

---

[16] The respondent told A.G., "It's good to talk to mom, have connections to mother, go to mom." (Tr. 396:13-16.)

[17] Unlike most proceedings of this kind, the respondent did not disparage the petitioner or level any accusations against her; on the contrary, it appeared that he tried to avoid saying anything derogatory about her.

16

37 at 6–7), and that A.G. would suffer psychological harm if he were "sent back into the environment of his abuse and deterioration." (*Id.*) The petitioner responds that "there has never been a single complaint filed with British Judicial or Rabbinical authorities against [the p]etitioner for mistreatment of any of her children." (ECF No. 32 at 7.) She argues that the testimony of abuse is "self-serving and incredulous." (*Id.* at 8.)

The Court agrees that the respondent has not established that the petitioner poses a grave risk of harm to A.G., even if she did punish him physically. *See Souratgar v. Lee*, 720 F.3d 96, 104 (2d Cir. 2013) ("isolated incidents" of discipline does not constitute grave risk); *Saavedra v. Montoya*, No.21-CV-5418, 2023 WL 2910654, at *15 (E.D.N.Y. Apr. 12, 2023) (evidence that petitioner spanked his child and left a mark was fundamentally disciplinary in nature and did not constitute a grave risk of harm); *In re Filipczak*, 838 F.Supp.2d 174, 180 (S.D.N.Y.2011); *Rial v. Rijo*, No. 10–CV–01578, 2010 WL 1643995, at *2 (S.D.N.Y. Apr. 23, 2010.).

The Court has, however, considered the extent to which returning A.G. to England would expose him to a grave risk of emotional harm. Although there is little if any expert testimony on this subject, there is significant evidence that sending A.G back to England would cause him substantial distress. It was evident when the Court interviewed him that A.G. is deeply concerned about having to return. The respondent also testified that A.G. has "nightmares that people come to bring him back to England" (Tr. 457:3-4), and becomes visibly "shaky and jumpy" at the thought of being sent back. (Tr. 186:11-14.) Although perhaps not rising to the level of grave risk, which requires "serious abuse or neglect, or extraordinary emotional dependence,"[18] the possibility that A.G. will suffer emotional and psychological harm is

---

[18] "The potential harm to the child must be severe, and the level of risk and danger required to trigger this exception has consistently been held to be very high." *Souratgar*, 720 F.3d at 103. The grave risk determination includes both "the magnitude of the potential harm" and "the probability that the harm will materialize." *Id.*

17

considerable; while not decisive, it is a factor in the Court's decision. *See Application of Blondin v. Dubois*, 78 F. Supp. 2d 283, 296 (S.D.N.Y. 2000), *aff'd sub nom. Blondin v. Dubois*, 238 F.3d 153 (2d Cir. 2001) (courts consider multiple factors in denying Hague Convention petition).

It is clear that A.G.'s desire to stay in New York is not merely a "wish," but a firm conviction. *See Matovski v. Matovski*, No. 06-CV-4259, 2007 WL 2600862, at *14 (S.D.N.Y. Aug. 31, 2007). The Court credits his description of his life in Manchester and his life in New York, which is also corroborated by other testimony. Accordingly, the Court will not order that he be sent back to the United Kingdom. *See Royal Borough of Kensington & Chelsea v. Bafna-Louis*, No. 22-CV-8303, 2023 WL 2387385, at *22 (S.D.N.Y. Mar. 7, 2023), *aff'd*, No. 23-470, 2023 WL 6173335 (2d Cir. Sept. 22, 2023), *and aff'd*, No. 23-470, 2023 WL 6867135 (2d Cir. Oct. 18, 2023) (declining return of child whose thoughtful conviction was to stay in the United States and not return to London); *Laguna v. Avila*, No. 07-CV-5136, 2008 WL 1986253, at *12 (E.D.N.Y. May 7, 2008); *Valles Rubio*, 2019 WL 5189011, at *21; *see also Matovski*, 2007 WL 2600862, at *15; *Diaz Arboleda v. Arenas*, 311 F. Supp. 2d 336, 343–44 (E.D.N.Y. 2004).

The petition is denied.

## CONCLUSION

For these reasons, the petition is denied. The Clerk of Court is respectfully directed to enter judgment in favor of the respondent and close the case.

**SO ORDERED.**

                                              s/Ann M. Donnelly

                                              ANN M. DONNELLY
                                              United States District Judge

Dated: Brooklyn, New York
        March 31, 2024